IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

FREDERICK W. MCFEETERS                                    PLAINTIFF

v.                              CIVIL NO. 19-2045

ANDREW M. SAUL, Commissioner
Social Security Administration                           DEFENDANT

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff, Frederick W. McFeeters, brings this action pursuant to 42 U.S.C. § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security Administration (Commissioner) denying his claims for a period of disability and disability insurance benefits (DIB) under the provisions of Title II of the Social Security Act (Act). In this judicial review, the Court must determine whether there is substantial evidence in the administrative record to support the Commissioner's decision. See 42 U.S.C. § 405(g).

I.      **Procedural Background:**

Plaintiff protectively filed his current application for DIB on March 13, 2017, alleging an inability to work since January 14, 2012,[1] due to post-traumatic stress disorder, lumbar pain, left ankle pain and problems, tinnitus, bilateral knee pain, right shoulder pain, right hand and wrist pain and problems, depression, feet pain and irritable bowel syndrome. (Tr. 160). For DIB purposes, Plaintiff maintained insured status through December 31, 2017. (Tr. 10, 167). An administrative hearing was held on September 27, 2018, at which Plaintiff appeared with counsel and testified. (Tr. 28-55).

---

[1] Plaintiff, through his counsel, amended his alleged onset date to January 19, 2017. (Tr. 10, 31-32).

By written decision dated December 5, 2018, the ALJ found that during the relevant time period, Plaintiff had an impairment or combination of impairments that were severe. (Tr. 12).  Specifically, the ALJ found through the date last insured Plaintiff had the following severe impairments: spine disorders; hearing loss not treated with cochlear implantation; tinnitus; depressive disorder; anxiety; post-traumatic stress disorder (PTSD); and obesity. However, after reviewing all of the evidence presented, the ALJ determined that through the date last insured Plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4.  (Tr. 13).  The ALJ found through the date last insured, Plaintiff retained the residual functional capacity (RFC) to:

> perform medium work as defined in 20 CFR 404.1567(c) except able to handle and finger on a bilateral basis frequently; foot control operation on a bilateral basis would be frequent; limited to jobs that do not require frequent telephone communication; able to perform work where interpersonal contact is routine but superficial, complexity of tasks is learned by experience with several variables and judgement within limits, and the supervision required is little for routine but non-routine (sic).[2]

(Tr. 15).  With the help of a vocational expert, the ALJ determined that through the date last insured, Plaintiff could perform his past relevant work as an appliance assembler, as actually and generally performed.  (Tr. 21).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on February 8, 2019.  (Tr. 1-4).  Subsequently, Plaintiff filed this action.  (Doc. 1).  Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation.  (Docs. 10, 11).

---

[2] The Court notes both parties presumed the typo to be a scrivener's error.  (Doc. Doc. 10, p. 7; Doc. 11, p.6).  The Court agrees, and notes that the hypothetical proposed to the vocational expert included that the supervision required was detailed for non-routine tasks. (Tr. 48).

The Court has reviewed the entire transcript. The complete set of facts and arguments are presented in the parties' briefs, and are repeated here only to the extent necessary.

## II. Evidence Presented:

At the administrative hearing held before the ALJ on September 27, 2018, Plaintiff, who was fifty-nine years of age at the time of the hearing, testified he had obtained a high school education and an associate degree. (Tr. 33). The record revealed Plaintiff's past relevant work consists of work as an appliance line assembler or air conditioner assembler and a shipping and receiving clerk. (Tr. 48).

Prior to the relevant time period Plaintiff sought treatment for various impairments including but not limited to depression, anxiety, PTSD, back pain, hip pain and foot pain.

The pertinent medical evidence for the time period in question reflects the following. On January 19, 2017, Plaintiff was admitted after it was determined that Plaintiff was unable to maintain safety in a less secure environment due to homicidal ideation, and history of instability with his spousal relationship for quite some time. (Tr. 398-401, 424-425, 667-811). Dr. Graham M. Reid noted Plaintiff had been to the hospital for a similar situation not long ago. Plaintiff reported he was depressed because he could not take care of his wife and would get angry with her. Plaintiff reported his wife had a CVA and that he had been taking care of her since January of 2016. Plaintiff reported that he and his wife had also been staying with his mother which caused additional stress. Plaintiff reported a few days prior to his admission he had an argument with his wife over a toothbrush and had screamed at her which caused his wife to pull her hair out. Plaintiff reported he could not deal with the situation and his mental health provider instructed him to come to the emergency department.

3

While admitted Plaintiff was provided a safe, supportive, structured, and low stress environment. Plaintiff was discharged on January 28, 2017, in stable condition.  At the time of discharge, Plaintiff reported improved mood and sleep and denied homicidal or suicidal ideation. Upon discharge Plaintiff had no dietary restriction, no physical restrictions, was able to manage self/funds and was capable of employment.  Dr. Reid opined Plaintiff's prognosis was good with continued outpatient treatment compliance.

On January 30, 2017, Plaintiff was seen for a cataract evaluation.  (Tr. 312).  Plaintiff complained of a glare due to headlights while driving at night.  Plaintiff planned to undergo cataract surgery.

On February 6, 2017, Plaintiff participated in his depression group led by Ms. Angela M. Loggains, LCSW.  (Tr. 664-665).  Plaintiff reported he was doing fine.  Plaintiff indicated he was upset at the VA (Veterans Administration) emergency room as they had a doctor that could barely speak English.  Plaintiff reported he would never go to the emergency room again.  Ms. Loggains noted Plaintiff asked questions related to depression.

On February 13, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 663).  Plaintiff reported he was doing fine.  Plaintiff was active in group discussion and described his own depressive experience.

On February 16, 2017, Plaintiff participated in a treatment plan with Ms. Loggains and Dr. Tiffany N. Mattingly.  (Tr. 656-662).  Plaintiff reported he had been admitted after being stressed out with caring for his wife.  Plaintiff indicated his wife now lived with their son who was applying for guardianship.  Plaintiff indicted that he visited his wife three time a week for several hours and went to church with the family.  Plaintiff felt guilty about pawning his wife off on his son who also cared for an autistic child.  Plaintiff reported he had

4

completed his associate degree and was trying to decide where to go to get his bachelor's degree.  Plaintiff expressed the desire to have a service dog to help with his PTSD and depression.

On February 21, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr 652-653).  Plaintiff reported he was doing fine.  Ms. Loggains noted Plaintiff was active in group discussion.

On February 24, 2017, Plaintiff was seen by Charles E. Wall, Jr., PA, for a psychiatric evaluation after discharge. (Tr. 647-652). Plaintiff denied back pain, joint pain, or joint deformity. Plaintiff described anger and frustration about being the caregiver for his wife who was suffering from depression and was primarily bedridden.  PA Wall noted and Plaintiff acknowledged that Plaintiff's wife had a CVA.  Plaintiff reported he had been upset with his wife because she would not do anything, and that since his discharge, his wife had been staying with their son.  Plaintiff reported his primary interest was going to school, that he had talked to vocational rehabilitation and that they were unwilling to continue sending him to school.  PA Wall noted Plaintiff had graduated from Carl Albert College with an associate degree in film.  PA Wall noted Plaintiff became animated when talking about film projects done at home. Plaintiff denied missing work.  Plaintiff's treatment plan consisted of medication and outpatient therapy.

On March 13, 2017, Plaintiff participated in his depression group led by Ms. Loggains.  (Tr. 639).  Plaintiff reported he was tired all of the time and thought his medication needed adjustment.  Ms. Loggains noted Plaintiff recently underwent cataract surgery.  Plaintiff had also entered an art contest and won two first place awards.  Plaintiff

requested to start peer support therapy with Hector Ruiz.  Ms. Loggains noted Plaintiff was active in group discussion.

On March 14, 2017, Plaintiff was seen by Dr. Mattingly for a follow-up for his depression. (Tr. 624-632).  Plaintiff reported that his wife was living with their oldest son to help reduce Plaintiff's stress. Plaintiff shrugged his shoulders when asked how things were going.  Plaintiff reported he had felt overwhelmed with taking care of his wife which had led to his admission for mental health treatment in January.  Plaintiff worried that he was too medicated at times but denied side effects.  Plaintiff reported that he continued to go to therapy and felt this was helping his mood and anxiety.  Plaintiff reported a pain level of zero and denied back or joint pain. Upon examination, Dr. Mattingly noted Plaintiff had intact recent and remote memory, average attention and concentration, and intact judgment and insight.  Plaintiff was to continue with medication and therapy.

On March 27, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 622-623).  Plaintiff reported he had his ups and downs.  Plaintiff indicated he had received the application for a service dog.  Ms. Loggains noted Plaintiff was active in group discussion.

On March 31 2017, Plaintiff had a routine hearing aid check.  (Tr. 620).  Plaintiff reported the aids worked with good volume and clarity.  Plaintiff was satisfied with the performance of the aids.

On March 31, 2017, Plaintiff participated in a wellness group led by Shannon L. Garner, LCSW.  (Tr. 621-622).  Ms. Garner noted this was Plaintiff's first time with the group and that he appeared anxious.  Plaintiff walked two miles but was noted to struggle

some with the walk.  Plaintiff reported he would return to the group, but not the next week, as he would be undergoing eye surgery.

On April 7, 2017, Plaintiff participated in a wellness group led by Ms. Garner. (Tr. 619-620).  Plaintiff reported a good week.  Ms. Garner noted Plaintiff interacted well with the group and walked approximately 1.5 miles.

On April 10, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 619).  Plaintiff reported he could finally see with both eyes since having his cataracts removed.  Plaintiff indicated he had recently gone to a comedy club to listen to a teacher of his present and that he had a good time.  Plaintiff reported that if it was not for his depression he would probably still be working at Trane.  Ms. Loggains noted Plaintiff was active in group discussion.

On April 14, 2017, Plaintiff participated in a wellness group led by Ms. Garner.  (Tr. 609-610).  Ms. Garner noted Plaintiff seemed to be less anxious around group members and even made jokes.  Plaintiff walked about two miles.

On April 18, 2017, Plaintiff met with Ms. Loggains for individual therapy.  (Tr. 605-608).  Plaintiff reported he took his wife to church on Sunday and they saw their granddaughter that was adopted out.  Plaintiff reported he had been staying with his mom since having cataract surgery but would eventually move back home.  Plaintiff indicated he was excited about getting a therapy dog and wondered how that worked.  Plaintiff also reported that as a child he stuttered when anxious and that this still impacted him.  Ms. Loggains noted Plaintiff's mood was happy and his affect was bright and talkative. Plaintiff was to continue with medication, group therapy and peer support therapy.

On April 17, 2017, Ms. Loggains also completed a Mental Residual Functional Capacity Assessment opining that Plaintiff had no useful ability to function on a sustained basis in most areas of functioning.  (Tr. 313).  Dr. Mattingly signed off on this assessment.

On April 17, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 608).  Plaintiff reported he had his interview for a therapy dog.  Ms. Loggains noted Plaintiff was active in group discussions.

On April 18, 2017, Dr. Mattingly opined that Plaintiff had a global assessment of functioning (GAF) score of 49.  (Tr. 314-315).

On April 24, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 603). Plaintiff reported that his week went okay.  Ms. Loggains noted Plaintiff was active in group discussion.

On May 8, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 600).  Plaintiff reported that the previous Friday was his first day interacting with a dog program and then he and his son graduated from Carl Albert the next day.  Plaintiff indicated he had a good week. Plaintiff reported that his thoughts sometimes made him feel down.  Ms. Loggains noted Plaintiff was active in group discussions.

On May 8, 2017, Plaintiff participated in an initial individual peer mentoring with Mr. Hector Ruiz, a peer specialist. (Tr. 601-602).  Mr. Ruiz noted Plaintiff was referred by Ms. Loggains.  Plaintiff discussed his many challenges and dissatisfactions but expressed that he was coping and handling things well enough.  Plaintiff reported he needed help with his service connected disability claim.  Mr. Ruiz problem solved with Plaintiff to help determined a fruitful way to search for the information needed.

On May 15, 2017, Plaintiff was seen by Dr. Mattingly for a follow-up for his mood and anxiety. (Tr. 589-598).  Plaintiff reported his pain level was a zero.  Plaintiff reported that he was okay and that his mood was okay.  Plaintiff reported that his wife continued to be in poor health and that it is now too much stress for his son as well.  Plaintiff reported the family was looking into putting his wife in a nursing home.  Plaintiff reported he had started to attend church and that his had become a good source of support for him. Plaintiff reported that he was asked to take pictures for the church, and that he was looking forward to working on backdrops.  Plaintiff had also started working with a service dog program and hoped to have a service dog soon.  Dr. Mattingly noted Plaintiff reported he was having difficulty with low energy and she suggested Plaintiff increase his physical activity.  Plaintiff reported he had been walking with his wellness group but had stopped and that he would consider restarting with this group.  Plaintiff indicated that he continued to worry about the situation with his wife.  Plaintiff reported he was writing a book to help reduce his stress.  Upon examination, Dr. Mattingly noted Plaintiff had intact recent and remote memory, average attention and concentration and intact judgment and insight.  Plaintiff was to continue with his medication  and therapy.

On May 22, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 587-588).  Mr. Ruiz reported he and Plaintiff discussed Plaintiff's plan to request his military file so that he could search an important event that occurred while he was in the service.  Plaintiff indicated he thought he could use this information in his application for his service connected disability claim.  When asked about his daily routine, Plaintiff reported he had no routine.  Plaintiff reported he had started to write a book just to have something to do but that was not satisfying.  Plaintiff reported that he felt like a loser as he had never been

successful at doing anything.  Mr. Ruiz noted when he asked Plaintiff follow-up questions, Plaintiff indicated the session was not working and left.  Mr. Ruiz noted he would schedule a follow-up session to see if Plaintiff re-engaged.

On May 30, 2017, Plaintiff was seen in the eye clinic.  (Tr 584-586).  Plaintiff was in for post-op cataract glasses. After examining Plaintiff, Dr. Mary Jo Horn, OD, noted Plaintiff was doing well.  Plaintiff's glasses were ordered and he was instructed to contact the office if he experienced blurred vision or any other changes.  Plaintiff was to return in nine months.

On June 5, 2017, Plaintiff participated with individual peer mentoring with Mr. Ruiz. (Tr. 580-582). Mr. Ruiz indicated that the purpose of this session was to re-engage with Plaintiff after the last session when Plaintiff became upset and abruptly left.  Plaintiff reported he could not remember why he had been upset.  Mr. Ruiz and Plaintiff discussed plans to order Plaintiff's military file so that Plaintiff could look up an event that occurred. When Mr. Ruiz inquired about Plaintiff's week, Plaintiff reported he had traveled to Alabama over the weekend to help his son with a job.

On June 5, 2017, Plaintiff underwent a left foot x-ray that revealed status post open reduction internal fixation of old distal fibular injury with no acute osseous abnormality of the left foot. (Tr. 346-347). A x-ray of the right foot revealed no significant radiographic abnormality.

On June 8, 2017, Plaintiff was seen by Aimee D. Sanderson, RN.  (Tr. 579-580). Plaintiff was a walk-in with a complaint of a right thumb infection since May 30th.  Nurse Sanderson noted the area looked red, inflamed and pus filled.  Plaintiff was prescribed Amoxicillin.

On June 12, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 577-579). Mr. Ruiz noted Plaintiff brought his military file so that they could search for an important event, a physical attack by a larger soldier, during Plaintiff's military service. Plaintiff hoped to include the incident in his application for a service connected disability claim. Plaintiff also wanted to remember the name of a separate soldier that saved his life and to possibly use the event as an avenue to receive some type of recognition. Plaintiff agreed to make a written list of events to help with the search and to then submit a request.

On June 12, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 577). Plaintiff reported he had been doing okay. Plaintiff reported he had gone to Kansas with his mother and to Alabama to help his son. Ms. Loggains noted Plaintiff was attentive during the session but did not say much.

On June 19, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 574). Plaintiff reported his past week had been okay. Ms. Loggains noted Plaintiff was attentive but not verbally involved in group discussion.

On June 19, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 575-576). Mr. Ruiz noted Plaintiff did not bring the list of his memories from the traumatic incident that had been discussed during the previous sessions. Plaintiff reported he had visited his wife, worked on a book writing projected and attended church twice over the past week. Mr. Ruiz noted he congratulated Plaintiff on restarting his book writing project and attending church.

On June 26, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 572-574). Mr. Ruiz noted Plaintiff brought a thumb drive with an electronic copy of a letter Plaintiff sent asking for an inquiry into a traumatic event that happened during his

military service in Germany.  Mr. Ruiz noted he agreed to help Plaintiff restructure the letter format to help with a second inquiry letter.  Mr. Ruiz noted Plaintiff was much more open and relatively relaxed.  Plaintiff shared his past week's activities and seemed to smile more. Plaintiff discussed research he had done regarding some religious subjects that had caused him some confusion.  Mr. Ruiz noted he and Plaintiff would meet briefly the next day so that Mr. Ruiz could show Plaintiff the RSVP office location.  Mr. Ruiz noted this office helped connect volunteers with agencies.

On June 26, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 571). Plaintiff reported he was looking for a nursing home for his wife but found he was unable to afford it.  Plaintiff reported he was dealing with the guilt from his wife saying no one wanted her.  Plaintiff indicated he was looking into the possibility of volunteering. Plaintiff also stated that it looked like he would not be approved for disability of social security.

On June 29, 2017, Plaintiff called his treatment provider to report pain where his gallbladder used to be and that something was leaking from his belly button.  (Tr. 569-571). Plaintiff also reported problems with indigestion.   Dr. Jimmy D. Acklin prescribed medication for indigestion.  Plaintiff was also to undergo an US of the abdomen and lab work.

On June 30, 2017, Plaintiff was seen by Ms. Loggains for individual therapy.  (Tr. 566-569).  Plaintiff reported he had been looking for a nursing home for his wife as the family could no longer take care of her.  Plaintiff reported that most of the nursing homes required Plaintiff to use all that his wife had before the nursing home would help financially.

Plaintiff reported he was tired of crying.  Plaintiff reported most of the crying was due to the situation with his wife.  A plan for individual and group therapy was established.

On July 3, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 564-565).  Mr. Ruiz noted he gave Plaintiff a thumb drive with a restructured letter format to help Plaintiff start the process of requesting a second inquiry.  Plaintiff agreed to make improvements and that they would meet in two weeks.

On July 10, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 563-564).  Plaintiff reported he was doing okay.  Plaintiff reported no real changes and that overall, he had felt tired.  Plaintiff indicated that he did crosswords.  Ms. Loggains noted Plaintiff was active in group and talked about raising his children.

On July 12, 2017, Plaintiff underwent a chest x-ray that revealed no significant change since January 3, 2015.  (Tr. 345-346).

On July 17, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 559-560).  Plaintiff reported he had made some progress on a few things since his last session.  Plaintiff indicated he had already re-submitted his edited and newly formatted letter to his VSO for a renewed inquiry into the traumatic episode mentioned in his letter.  Plaintiff reported he also visited with his wife for a little longer period of time than usual and worked on placing her with a nursing home.  Plaintiff indicated that he went to church recently and that their sons coaxed his wife into playing the piano after church.  Mr. Ruiz discussed ideas to make Plaintiff's visits with his wife better for her.

On July 25, 2017 , Dr. Alvin Smith, a non-examining medical consultant, completed a Mental RFC Assessment opining that Plaintiff was moderately limited in some areas of functioning. (Tr. 69-71).   On the same date, Dr. Smith completed a Psychiatric Review

Technique form opining that Plaintiff had mild difficulties with understanding, remembering and applying information; moderate difficulties interacting with others; mild difficulties in maintaining concentration, persistence and pace; and moderate difficulties with adapting and managing oneself. (Tr. 66). On November 22, 2017, after reviewing the records, Dr. Abesie Kelly affirmed Dr. Smith's opinion. (Tr. 87, 90-92).

On July 31, 2017, Plaintiff underwent lumbar spine x-rays that revealed minimal degenerative changes in the lower thoracic, upper lumbar spine region. (Tr. 319-322). The x-ray was otherwise normal. X-rays of Plaintiff's left knee, left hip, and right knee revealed no significant radiographic abnormalities.

On July 31, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 556). Plaintiff reported he had a good week. Plaintiff reported his wife stayed at the house for a few days and did not want to go back to their son's home. Plaintiff reported he had his "comp and pension" appointment tomorrow. Plaintiff also reported that he would pick up his service dog on Friday and was anxious that he might mess things up. Ms. Loggains noted Plaintiff was active in group activity and discussion.

On August 1, 2017, Plaintiff underwent a consultative general physical examination performed by Dr. Van Hoang. (Tr. 324-330). Upon examination, Dr. Hoang noted Plaintiff had 20/25 vision in the left eye, and 20/20 vision in the right eye. Plaintiff was able to hear normal conversation with the use of hearing aids. Dr. Hoang estimated Plaintiff's hearing loss was twenty to thirty percent. Plaintiff had normal range of motion in his spine and extremities. Dr. Hoang noted Plaintiff had no muscle spasm and negative straight-leg raise testing. Plaintiff had no muscle weakness or atrophy and no sensory abnormalities. Plaintiff exhibited an antalgic gait. Upon a limb function evaluation, Dr. Hoang reported Plaintiff was

able to hold a pen and write; to touch fingertips to palm; to grip 100%; to oppose thumb to fingers; to pick up a coin; to stand and walk without assistive devices; to walk on heel and toes; and to squat and arise from a squatting position.  Regarding Plaintiff's mental status, Dr. Hoang opined Plaintiff was oriented to time, person and place.  Dr. Hoang noted there was no evidence of psychosis or serious mood disorder.  Plaintiff was assessed with post-traumatic stress disorder, chronic depression, chronic post traumatic arthralgia of the left foot, inflammatory bowel disease by history, bilateral foot/leg pain due to bone spurs in heels, and bilateral hearing impairment.  Dr. Hoang opined that Plaintiff had a remarkable physical limitation for laborious works.

On August 7, 2017, Plaintiff participated in a peer support/anxiety group led by Linda L. Husser, a peer specialist.  (Tr.  554-555).  Ms. Husser noted Plaintiff presented with his service dog and participated in group.  Plaintiff reported he took his support dog out in public to a store and was a little worried but everyone was understanding.  Plaintiff shared with the group that he had attended his social security hearing and felt that the evaluator was condescending.  Plaintiff reported he maintained his composure despite losing his temper.

On August 7, 2017, Plaintiff participated in individual peer mentoring Mr. Ruiz. (Tr. 553-554).  Mr. Ruiz noted Plaintiff had made some progress on a few things since the last session.  Plaintiff reported he spent Saturday with his wife and they went out to eat.  Plaintiff also took possession of his service dog which he introduced to his wife.

On August 7, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 552).  Plaintiff reported he was able to bring his service dog and that the dog was doing well.  Plaintiff reported that he did not think his social security hearing went well.

Ms. Loggains noted Plaintiff was active in group discussion and asked questions to gain better knowledge.

On August 14, 2017, Plaintiff had a follow-up appointment with Dr. Mattingly.  (Tr. 547-552).  Plaintiff reported that he was "pretty good" and was happy to have a service dog. Plaintiff reported that his wife was living with their son but they were looking into nursing home options as his wife's care had been overwhelming for the whole family.  Plaintiff reported he had been caring for his wife some on the weekends to give his son and family a break but it had been hard.  Plaintiff reported continued difficulty with depression.  Plaintiff reported his mood was better than it had been at the previous appointment. Plaintiff reported he had been busy writing a book and had enjoyed working on it.  Dr. Mattingly noted Plaintiff had recently had a doctor appointment for his SSI case, and that Plaintiff felt it did not go well as the examiner had made him mad.  Plaintiff reported his medication had been fine but he had difficulty with dry mouth.  Upon examination, Dr. Mattingly noted Plaintiff was well groomed and was wearing casual attire.  Plaintiff was noted as cooperative with the interview but guarded.  Plaintiff made good eye contact.  Dr. Mattingly noted Plaintiff's recent and remote memory were intact and Plaintiff had average attention and concentration. Plaintiff was assessed with a major depressive disorder, recurrent, moderate.  Plaintiff was to continue with his medication and individual and group therapy.

On August 14, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 544).  Plaintiff reported he was doing really good.  Ms. Loggains noted Plaintiff reported the service dog made the difference.  Plaintiff was active in group discussion.

On August 15, 2017, Plaintiff underwent a consultative examination performed by Dr. Jared Spencer. (Tr. 334-336). Plaintiff reported that his family initially noted his hearing loss after he returned from service in Desert Storm. Plaintiff reported significant noise exposure during that time. Dr. Spencer noted Plaintiff had bilateral non-pulsatile ringing tinnitus. Plaintiff had worn hearing aids for four years. Dr. Spencer noted that audiometry revealed a mild sloping to severe SNHL bilaterally with word discrimination scores of 88% on the right and 92% on the left. Plaintiff reported he had stopped smoking. Upon examination, Dr. Spencer noted Plaintiff was well-dressed and groomed and appeared well and in no acute distress. Plaintiff's mental and emotional status were noted as within normal limits. Plaintiff had a normal mood and affect. Dr. Spencer assessed Plaintiff with bilateral SNHL. Plaintiff was noted as doing well with bilateral hearing aids from the VA. Plaintiff was also assessed with bilateral tinnitus which was consistent with hearing loss.

On August 18, 2017, Plaintiff underwent an echogram of the abdomen that revealed:

> Diffusely increased echogenicity of the liver compatible with fatty infiltration versus hepatocellular disease. Limited evaluation of the liver due to ultrasound beam attenuation. Consider CT for further evaluation as clinically indicated in this patient with right upper quadrant pain after cholecystectomy.

(Tr. 344-345).

On August 18, 2017, Plaintiff was seen by Sara M. McCoy, DPM, for a podiatry consult. (Tr. 419-422, 537-543). Plaintiff reported he was wearing out the outsides of his shoes. Plaintiff reported a history of heel spur surgery in the past and toenail removal per Dr. Crotty. Plaintiff indicated he had difficulty trimming his nails, as several were thick and he could not trim them with regular nail trimmers. Dr. McCoy recommended an orthotics

17

consult, trimmed Plaintiff's nails and recommended the use of an antifungal powder or spray and cream.

On August 21, 2017, Plaintiff was seen by Dr. Acklin for an abdominal pain follow-up. (Tr. 527-537).  Plaintiff reported right upper quadrant pain for about one year.  Plaintiff noted the pain was intermittent and lasted one to two hours when it occurred.  Plaintiff also reported alternating diarrhea and constipation, but Dr. Acklin noted this was a long standing issued and had not changed with the pain.  After examining Plaintiff, Dr. Acklin indicated Plaintiff would undergo and an EGD (Tr. 415), a colonoscopy and CT scan of the abdomen.

On August 21, 2017, Plaintiff participated in his depression group led by Ms. Loggains.  (Tr. 525-526).  Plaintiff reported his week had been okay.  Ms. Loggains noted Plaintiff was playfully interactive with his dog.  Plaintiff was also active in group discussion.

On August 22, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 524-525).  Mr. Ruiz noted Plaintiff was slightly late for the appointment.  Plaintiff reported he had made progress on numerous things.  Plaintiff reported that he spent the weekend with his wife, although he admitted he sometimes felt like filing for divorce when he felt overwhelmed with his wife's health issues.  Plaintiff reported he was still adjusting to his service dog.  Mr. Ruiz noted Plaintiff was noticeably attentive to the training and obedience of his training dog and smiled often.  Plaintiff exhibited an easiness of personality that Mr. Ruiz had not previously observed.

On August 29, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 521).  Plaintiff reported he was doing okay other than his cholesterol being up. Plaintiff introduced his service dog.  Plaintiff was active in group discussion.

On September 5, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 520).  Plaintiff reported he spent time in Little Rock with his wife who fell and broke her tailbone.  Ms. Loggains noted Plaintiff was active in group discussion.

On September 6, 2017, Plaintiff participated with individual peer mentoring with Mr. Ruiz. (Tr. 518-519).  Mr. Ruiz noted Plaintiff displayed a much better mood, smiled often and even laughed.  Mr. Ruiz noted Plaintiff continued to be attentive to the training of his service dog.  Plaintiff mentioned that his grandchildren really enjoyed the service dog, albeit with limited contact, as the dog's trainer had cautioned Plaintiff about allowing too much contact when the dog was "working."  Plaintiff also discussed the progress he had made with requesting a post-service award for he and his co-worker for performance of duties while deployed.  Plaintiff asked Mr. Ruiz to read the request and to offer suggestions for improvement.  Mr. Ruiz noted that instead he helped Plaintiff do a search on-line regarding how to request an award.

On September 20, 2017, Plaintiff participated in his depression group led by Ms. Loggains.  (Tr. 509-510). Ms. Loggains noted Plaintiff reported privately that he had a meeting with an attorney about this wife.  Plaintiff was active in group discussion and laughed with his peers.  Ms. Loggains noted Plaintiff even shared a joke.

On September 20, 2017, Plaintiff underwent a CT of the abdomen that revealed hepatic steatosis, a non-obstructing sub-5mm renal calculus on the right and benign/chronic findings.  (Tr. 343-344, 510-512).

On September 25, 2017, Plaintiff underwent x-rays of his right and left feet that revealed small calcaneal spurs but no acute osseous abnormalities. (Tr. 339-341). A x-ray of Plaintiff left ankle revealed an internal fixation of distal fibular fracture with good alignment.

On September 27, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 506). Plaintiff reported he was doing fine. Plaintiff reported privately that he was working with an attorney about obtaining power of attorney for his wife. Plaintiff reported if this happened his wife would probably move to a nursing home soon. Plaintiff was active in group discussion and laughed with his peers.

On October 3, 2017, Plaintiff participated in his depression group led by Ms. Loggains. (Tr. 504). Plaintiff reported he was doing good. Plaintiff indicated he was working on the power of attorney for his wife. Ms. Loggains noted Plaintiff was active in group discussion and laughed with his peers.

On October 4, 2017, Dr. Charles Friedman, a non-examining medical consultant, completed a RFC assessment opining that Plaintiff could occasionally lift or carry fifty pounds, frequently lift or carry twenty-five pounds; could stand and/or walk for a total of six hours in an eight-hour workday; could sit about six hours in an eight-hour workday; could push or pull unlimited, other than as shown for lift and/or carry; and that postural, manipulative, visual, communicative and environmental limitations were not evident. (Tr. 67-69). On November 21, 2017, after reviewing the records, Dr. Denise Greenwood affirmed Dr. Friedman's opinion. (Tr. 89-90).

On October 4, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 504-505). Plaintiff talked about progress he had made toward admitting his wife into a

nursing home.  Plaintiff indicated that his wife had only signed three of the five required documents, as Plaintiff's wife objected to the restriction of her control of certain aspects of her life and property.  Plaintiff also talked about the death of an aunt.  Plaintiff reported he was handling the death well, and would be traveling with his mother to another state for the memorial soon.

In a letter dated October 6, 2017, Ms. Loggains indicated the letter was being written at the request of Plaintiff.  (Tr. 342).  Ms. Loggains noted Plaintiff's concern recently about the Veterans Administration and Social Security not deeming him unemployable.  Plaintiff reported he could not return to factory work due to his severe anxiety.  Ms. Loggains noted Plaintiff also had a service dog that he took with him everywhere.  Plaintiff reported the dog helped with his anxiety but when it came to employment Plaintiff did not know what type of work setting would allow him to bring a dog to work.  Ms. Loggains noted Plaintiff was a much different person with his dog, but Plaintiff's anxiety was still at a level that would not be conducive to being employed.

On October 10, 2017, Plaintiff participated in his depression group led by Ms. Loggains.  (Tr. 503). Plaintiff reported he was fine.  Plaintiff reported that it was hard for him to open up to others.  Ms. Loggains noted Plaintiff was involved in group discussion and that he joked with peers.

On October 17, 2017, Plaintiff participated in his depression group led by Ms. Loggains.  (Tr. 494-495).  Ms. Loggains noted Plaintiff's report that he had been doctoring his dog that had some medical problems.  Plaintiff also reported that his wife would be moving permanently into a nursing home.

21

On October 25, 2017, Plaintiff underwent a colonoscopy and EGD. (Tr. 411-412, 475-494, 507-509, 1475-1476). The colonoscopy revealed a single rectal polyp, no cause of pain and no signs of inflammation. Plaintiff was to repeat this procedure in five years. The EGD revealed peptic ulcer disease in the stomach and small due/antral ulcers and mild nodular distal esophageal inflammation.

On November 1, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 474-476). Plaintiff talked about his efforts to admit his wife into a nursing home. Plaintiff was noted to be independent and doing very well in complying with homework assignments and treatment suggestions. Plaintiff was noted to use a licensed service dog for coping.

On November 27, 2017, Plaintiff participated in individual peer mentoring with Mr. Ruiz. (Tr. 1768-1769). Plaintiff discussed his dissatisfaction with his service dog and the program. Plaintiff recounted two incidents when the service dog misbehaved in front of the program staff. Plaintiff felt like the staff was looking for a way to kick him out of the program. Plaintiff reported he tried to comply with the program staff but drew the line at the program staff visiting his home. Plaintiff indicated he would try to comply with the program staff requests as he wanted to keep the dog.

On December 4, 2017, Plaintiff called to ask about a pain patch of something to help with his knee, back and shoulder pain. (Tr. 1767). Plaintiff reported he had been taken off oral NSAIDS due to his ulcers. Dr. Acklin recommended Plaintiff use diclofenac gel and if that did not work lidocaine gel might be prescribed.

On December 12, 2017, Plaintiff was seen by Ms. Loggains.  (Tr. 1758-1765).  Ms. Loggains noted Plaintiff took care of himself and his disabled wife.  Plaintiff reported the dog therapy program removed his service dog due to increased aggression in the dog. Plaintiff reported he did not want another service dog because he did not want to go through that loss again.  Plaintiff reported that his wife was now back in his home as the daughter-in-law had kicked his wife out.  Plaintiff indicated he could not find a nursing home to take his wife. Ms. Loggains asked Plaintiff to think about another service dog.

On December 19, 2017, Plaintiff participated in his depression group led by Ms. Loggains.  (Tr. 1751).  Plaintiff reported he was doing okay.  Plaintiff explained that he took his wife to her therapy appointment and she ended up walking out into the middle of traffic so she was now hospitalized.  Plaintiff also reported that the dog therapy group might help him train his own dog to become a therapy dog.  Ms. Loggains noted Plaintiff was involved in group discussion and joked with his peers.

On December 20, 2017, Plaintiff was seen by Dr. Mattingly for a follow-up for his depression.  (Tr. 1746-1750, 1751-1756).  Plaintiff reported his wife was in the hospital and that he no longer had his service dog.  Plaintiff reported the training people took the dog away from him.  Plaintiff reported his pain level was zero.  Plaintiff indicated his anxiety was high due to worry for his wife.  Plaintiff reported low energy and concentration and weight gain.  Upon examination, Dr. Mattingly noted Plaintiff had normal muscle strength and tone and a normal gait and coordination.  Plaintiff had an "I don't know" mood but was alert and oriented.  Plaintiff had intact recent and remote memory.  Plaintiff had average attention and concentration.  Dr. Mattingly made some medication adjustments and recommended continued therapy.

On December 27, 2017, Plaintiff participated in his depression group led by Ms. Loggains.   (Tr. 1746). Plaintiff reported his wife was still in the hospital. Plaintiff also reported he had lost his appeal for social security disability and that it would now go before a judge.  Ms. Loggains noted Plaintiff was involved in group discussion.

## III.   Applicable Law:

The Court reviews "the ALJ's decision to deny disability insurance benefits de novo on the record to ensure that there was no legal error and that the findings of fact are supported by substantial evidence on the record as a whole." Combs v. Berryhill, 878 F.3d 642, 645-46 (8th Cir. 2017).  "Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support a conclusion." Id.  The Court considers "the record as a whole, reviewing both the evidence that supports the ALJ's decision and the evidence that detracts from it." Id.  The Court will not reverse an administrative decision simply because some evidence may support the opposite conclusion. Perkins v. Astrue, 648 F.3d 892, 897 (8th Cir. 2011). If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the Court must affirm the ALJ's decision. Id.

It is well established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir.2001); see also 42 U.S.C. § 423(d)(1)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are

demonstrable by medically acceptable clinical and laboratory diagnostic techniques."   42 U.S.C. § 423(d)(3).  A Plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  See 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the Plaintiff's age, education, and work experience in light of his residual functional capacity.  See McCoy v. Schweiker, 683 F.2d 1138, 1141-42 (8th Cir. 1982), abrogated on other grounds by Higgins v. Apfel, 222 F.3d 504, 505 (8th Cir. 2000); 20 C.F.R. §§ 404.1520, 416.920.

**IV.    Discussion:**

Plaintiff argues the following issue on appeal: 1) the ALJ failed to fully and fairly develop the record; 2) the ALJ erred in determining Plaintiff's severe impairments; 3) the ALJ erred in the residual functional capacity determination; and 4) the ALJ erred in applying the vocational expert testimony to deny the claim at Step Four of the Sequential Evaluation.

**A.    Insured Status:**

In order to have insured status under the Act, an individual is required to have twenty quarters of coverage in each forty-quarter period ending with the first quarter of disability.

42 U.S.C. § 416(i)(3)(B). Plaintiff last met this requirement on December 31, 2017. Regarding Plaintiff's application for DIB, the overreaching issue in this case is the question of whether Plaintiff was disabled during the relevant time period of January 19, 2017, his amended alleged onset date of disability, through December 31, 2017, the last date he was in insured status under Title II of the Act.

In order for Plaintiff to qualify for DIB, he must prove that on or before the expiration of his insured status he was unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment which is expected to last for at least twelve months or result in death. Basinger v. Heckler, 725 F.2d 1166, 1168 (8th Cir. 1984).

**B.     Full and Fair Development of the Record:**

The ALJ has a duty to fully and fairly develop the record. See Frankl v. Shalala, 47 F.3d 935, 938 (8th Cir.1995). The ALJ's duty to fully and fairly develop the record is independent of Plaintiff's burden to press his case. Vossen v. Astrue, 612 F.3d 1011, 1016 (8th Cir. 2010). The ALJ, however, is not required to function as Plaintiff's substitute counsel, but only to develop a reasonably complete record. "Reversal due to failure to develop the record is only warranted where such failure is unfair or prejudicial." Shannon v. Chater, 54 F.3d 484, 488 (8th Cir. 1995). "While an ALJ does have a duty to develop the record, this duty is not never-ending and an ALJ is not required to disprove every possible impairment." McCoy v. Astrue, 648 F.3d 605, 612 (8th Cir. 2011).

In this case, the record consists of a consultative general physical examination; a consultative examination with an ear, nose and throat specialist; the assessments of four non-examining medical consultants; and Plaintiff's medical records. While Plaintiff argues the ALJ failed to obtain a proper assessment regarding Plaintiff's musculoskeletal impairments, a review of the medical evidence revealed that both during and after the relevant time period

26

Plaintiff was found have a normal gait, normal muscle strength and tone, and a pain level of zero.  (Tr. 550, 596, 626, 650, 1628, 1754). Plaintiff also walked one and one-half to three miles with his wellness group on numerous occasions during and after the time period in question. (Tr.  610, 620, 622, 1554).  As for Plaintiff's alleged disabling hearing loss, in August of 2017, Dr. Spencer noted Plaintiff was doing well with bilateral hearing aids. (Tr. 335).  After reviewing the entire record, the Court finds the record before the ALJ contained the evidence required to make a full and informed decision regarding Plaintiff's capabilities during the relevant time period.  Accordingly, the undersigned finds the ALJ fully and fairly developed the record.

### C.      Plaintiff's Impairments:

Plaintiff argues the ALJ erred by failing to find Plaintiff post-ORIF retained hardware of the left ankle and bilateral calcaneal spurs were not severe impairments.

At Step Two of the sequential analysis, the ALJ is required to determine whether a claimant's impairments are severe. See 20 C .F.R. § 404.1520(c).  While "severity is not an onerous requirement for the claimant to meet…it is also not a toothless standard." Wright v. Colvin, 789 F.3d 847, 855 (8th Cir. 2015) (citations omitted).  To be severe, an impairment only needs to have more than a minimal impact on a claimant's ability to perform work-related activities. See Social Security Ruling 96-3p.  The claimant has the burden of proof of showing he suffers from a medically-severe impairment at Step Two.   See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir.2000).

In determining Plaintiff's severe impairments, the ALJ noted the record showed Plaintiff had received treatment for calcaneal spurs in the past.  The ALJ pointed out that imaging of Plaintiff's right and left foot dated June 5, 2017, revealed no significant

radiographic abnormality of the right foot and status post open reduction internal fixation of old distal fibular injury with no acute osseous abnormality of the left foot.  The ALJ noted that on August 18, 2017, Plaintiff reported he was wearing out the outside of his shoes.  After examining Plaintiff, Dr. McCoy recommended orthotics and the use of an antifungal powder or spray and cream.  A review of the record also revealed Plaintiff met regularly with his wellness group that would walk one and one-half to three miles during a session.  After reviewing the record, the Court finds substantial evidence to support the ALJ's determination that Plaintiff's alleged left ankle pain and problems and foot pain were not severe impairments.

The Court further notes that while the ALJ did not find all of Plaintiff's alleged impairments to be severe impairments, the ALJ specifically discussed the alleged impairments in the decision, and clearly stated that he considered all of Plaintiff's impairments, including the impairments that were found to be non-severe. 20 C.F.R. § 416.945(a)(2) (in assessing RFC, ALJ must consider "all of [a claimant's] medically determinable impairments ..., including ... impairments that are not 'severe' "); § 416.923 (ALJ must "consider the combined effect of all [the claimant's] impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity"). After reviewing the record as a whole, the Court finds the ALJ did not commit reversible error in setting forth Plaintiff's severe impairments during the relevant time period.

### D.    Combination of Impairments:

Plaintiff appears to argue that the ALJ erred in failing to consider all of Plaintiff's impairments in combination.

The ALJ stated that in determining Plaintiff's RFC, he considered "all of the claimant's impairments, including impairments that are not severe."  The ALJ further found that the Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments.  Such language demonstrates the ALJ considered the combined effect of Plaintiff's impairments.  Hajek v. Shalala, 30 F.3d 89, 92 (8th Cir. 1994).

### E.     Subjective Complaints and Symptom Evaluation:

The ALJ was required to consider all the evidence relating to Plaintiff's subjective complaints including evidence presented by third parties that relates to: (1) Plaintiff's daily activities; (2) the duration, frequency, and intensity of his pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of his medication; and (5) functional restrictions.  See Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984).  While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole.  Id.  As the Eighth Circuit has observed, "Our touchstone is that [a claimant's] credibility is primarily a matter for the ALJ to decide."  Edwards, 314 F.3d at 966.

After reviewing the administrative record, it is clear that the ALJ properly considered and evaluated Plaintiff's subjective complaints, including the Polaski factors.   A review of the record revealed Plaintiff was able to take care of his personal needs; to care for the needs of his wife when she as living with him; to do household chores; to drive; and to prepare simple meals.  During the relevant time period, Plaintiff was able to drive to Alabama to help his son with a job, to watch a former teacher present at a comedy club, to take pictures for his church and to travel to a different state with his mother on at least two occasions. (Tr. 505,

577, 581, 594, 619).  After the relevant time period, the record revealed Plaintiff auctioned for a play, helped his mother with her yard work, helped his son work on his son's boat, and planned a trip to see an old military roommate.  (Tr. 1527, 1547, 1641, 1691).

With respect to Plaintiff's alleged mental and physical impairments the record revealed that Plaintiff responded well to treatment. Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009)(impairments that are controllable or amenable to treatment do not support a finding of disability).

Therefore, although it is clear that Plaintiff suffers with some degree of limitation, he has not established that he was unable to engage in any gainful activity prior to his date last insured.   Accordingly, the Court concludes that substantial evidence supports the ALJ's conclusion that Plaintiff's subjective complaints were not totally credible for the time period in question.

### F.      The ALJ's RFC Determination and Medical Opinions:

RFC is the most a person can do despite that person's limitations. 20 C.F.R. § 404.1545(a)(1).   It is assessed using all relevant evidence in the record. Id.  This includes medical records, observations of treating physicians and others, and the claimant's own descriptions of his limitations.  Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005); Eichelberger v. Barnhart, 390 F.3d 584, 591 (8th Cir. 2004).   Limitations resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. § 404.1545(a)(3). The United States Court of Appeals for the Eighth Circuit has held that a "claimant's residual functional capacity is a medical question."   Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).   Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace.  Lewis v. Barnhart, 353 F.3d 642, 646 (8th Cir. 2003).   "[T]he ALJ is [also] required to set forth

specifically a claimant's limitations and to determine how those limitations affect his RFC." Id.

In the present case, the ALJ considered the medical assessments of treating, examining and non-examining agency medical consultants, Plaintiff's subjective complaints, and his medical records when he determined Plaintiff could perform medium work with limitations.  The Court notes that in determining Plaintiff's RFC, the ALJ discussed the medical opinions of treating, examining and non-examining medical professionals, and set forth the reasons for the weight given to the opinions.  Renstrom v. Astrue, 680 F.3d 1057, 1065 (8th Cir. 2012) ("It is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians")(citations omitted); Prosch v. Apfel, 201 F.3d 1010 at 1012 (the ALJ may reject the conclusions of any medical expert, whether hired by the claimant or the government, if they are inconsistent with the record as a whole).

Plaintiff argues that the ALJ improperly discounted the opinion of Ms. Loggains, which was approved by Dr. Mattingly, that mentally, Plaintiff had no useful ability to function on a sustained basis in most areas of functioning.  After review, the Court finds that the ALJ did not err in discounting the opinions of Ms. Loggains and Dr. Mattingly. The ALJ declined to give controlling weight to Ms. Loggains and Dr. Mattingly's opinions for good and well-supported reasons.  See Goff v. Barnhart, 421 F.3d 785, 790–91 (8th Cir. 2005) ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount [the treating physician's] opinion.").

While Plaintiff argues that the ALJ erred in the analysis of Plaintiff's GAF scores, a GAF score is not essential to the RFC's accuracy.  Howard v. Commissioner of Social Security, 276 F.3d 235, 241 (6th Cir. 2002). "[A]n ALJ may afford greater weight to medical

evidence and testimony than to GAF scores when the evidence requires it." <u>Jones v. Astrue,</u> 619 F.3d 963, 974 (8th Cir. 2010). The ALJ also took Plaintiff's obesity into account when determining Plaintiff's RFC. <u>Heino v. Astrue</u>, 578 F.3d 873, 881-882 (8th Cir. 2009) (when an ALJ references the claimant's obesity during the claim evaluation process, such review may be sufficient to avoid reversal). Based on the record as a whole, the Court finds substantial evidence to support the ALJ's RFC determination.

### G.    Past Relevant Work:

Plaintiff has the initial burden of proving that he suffers from a medically determinable impairment which precludes the performance of past work. <u>Kirby v. Sullivan,</u> 923 F.2d 1323, 1326 (8th Cir. 1991). Only after the claimant establishes that a disability precludes the performance of past relevant work will the burden shift to the Commissioner to prove that the claimant can perform other work. <u>Pickner v. Sullivan</u>, 985 F.2d 401, 403 (8th Cir. 1993).

According to the Commissioner's interpretation of past relevant work, a claimant will not be found to be disabled if he retains the RFC to perform:

> 1.  The actual functional demands and job duties of a particular past relevant job; *or*

> 2.  The functional demands and job duties of the occupation as generally required by employers throughout the national economy.

20 C.F.R. §§ 404.1520(e); S.S.R. 82-61 (1982); <u>Martin v. Sullivan</u>, 901 F.2d 650, 653 (8th Cir. 1990)(expressly approving the two part test from S.S.R. 82-61).

The Court notes in this case the ALJ relied upon the testimony of a vocational expert, who after listening to the ALJ's proposed hypothetical question which included the

limitations addressed in the RFC determination discussed above, testified that the hypothetical individual would be able to perform Plaintiff's past relevant work.  See Gilbert v. Apfel, 175 F.3d 602, 604 (8th Cir. 1999) ("The testimony of a vocational expert is relevant at steps four and five of the Commissioner's sequential analysis, when the question becomes whether a claimant with a severe impairment has the residual functional capacity to do past relevant work or other work") (citations omitted).  Accordingly, the Court finds substantial evidence to support the ALJ's finding that prior to the expiration of his insured status Plaintiff could perform his past relevant work as an appliance line assembler, as actually and generally performed.

**V.     Conclusion:**

Based on the foregoing, the Court recommends affirming the ALJ's decision, and dismissing Plaintiff's case with prejudice.  **The parties have fourteen days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 7th day of April 2020.

/s/  *Erin L. Wiedemann*
HON. ERIN L. WIEDEMANN
UNITED STATES MAGISTRATE JUDGE